Our next case up this morning is Martin v. Actavis, 22-2664 and 22-2675, and Mr. Lawrence, you are appearing remotely. Can you hear me okay? Yes, I can. You're on. Okay, thank you. If there are any technical difficulties, we certainly won't count them against you. Just give us a waiver or something. Great, thank you. Thank you. Good morning, Mr. O'Brien. Good morning. May it please the Court, James Griffin O'Brien on behalf of Appellant Brad Martin. The central question here is whether a company can hide smoking gun evidence and then present the complete opposite case at trial. This was tried about a year and a half ago, August of 2021, ended in a defense verdict for Actavis, and several hours later, defense counsel submitted 101 pages that they had withheld of discovery. Well, let's walk through kind of the timeline, because on the question of diligence, I think that's really where we have to hone in. Sure. So this case birthed out of an MDL, in essence, and so it might be helpful to kind of talk through the timeline when the requests were made, the responses of the MDL that transitions over to Martin and to Davis. That might be the most helpful. Sure. So the requests were made very near the beginning of the MDL, which by memory is in the 2014-2015 range. First, some extensive written discovery requests, and those lead to extensive objections, and then those were never pursued. They were set aside. However, those requests would have included this document if it existed. The document itself wasn't created until— Can you be more specific in answering Judge Breyer's question? Where exactly did you request this document? I know you had a request for regulatory documents, but there was a specific date range for that that did not encompass this document. So the request had no date range at all. I understand, but it was then limited through the district court to 2010 to 2014. Well, we disagree. We don't think there was any such limit. For one thing, the text of Activist's response that put that limiter on it was actually just talking about marketing documents. But that objection that came in May of 2015, so in particular the request for production 27 that was issued February 2015, the objection from the defendants was this request is not reasonably limited as to time and scope. Then it goes to the next portion of that, and at that point, disclosures had been made through 2014. Well, I guess the point—I hope I understand Your Honor's question. I think those written discovery requests were not how discovery was done in the MDL at all. They were responded to and set aside, and two points to that. One is that the actual production went from 1995 to 2016, and only to 2016 because that's when the documents were being produced. The second point was that after those written discovery requests almost pro forma were done, the district court issued a case management order, CMO 15, that told us to meet and confer and create search terms. But that's going before the request for production is being made. The ESI protocol was actually issued November 6 of 2014. In response to that, the parties came together with the steering committee and developed RFPs, requests for production. The requests for production were issued in May of 2015. The defendants responded and made objections. There were no responses or motions to compel made to those objections. Your Honor makes an interesting point. CMO—so there were actually five or six testosterone defendants in this one MDL. AbbVie's Androgel, a different product, was out in front, and the court issued most CMOs related to that, and then came in and set schedules that were much later for activists and several other manufacturers. And so while it looks like CMO 15 goes first, and then those written requests happen next— Is that not how it happened? Well, technically that is correct, but what actually happened is that when the court told us to move on the activists and the auxilium and the other second-tier defendants, we started having meet and confers. The TSC sent those requests, they got those responses, and then long after that, we— So that's—now we're up to 2016. So December of 2016 is when the court extends non-expert fact discovery for activists. Right. I think that's correct, Your Honor. We had spent a year negotiating the search terms in that the search term negotiation—and there's an email that sums up the finalization—that happened long after those written discovery requests. And if I could directly address why didn't we bring a motion to compel if we were unhappy with the responses, and the reason we didn't bring a motion to compel is they weren't date-restricted at all. We were getting stuff from the beginning, 1995, all the way through the present, which was 2016 at that time. So there was no need to go in and complain about what activists had written in that document because it wasn't creating a barrier to our—to the production. In the search term, everything was controlled by search terms. They took a year to negotiate. They— Is there a date range? No. The court would have allowed a date range. There was none negotiated. I was actually the negotiator on behalf of the PSC, almost coincidentally, so I can speak quite authoritatively. Well, the court would have allowed activists to request one. They did not, and we did not agree to one. There's none in the email. There's none anywhere. Their argument is actually that the date range is—they have sort of a convoluted argument where they say, well, the date range is whenever any one employee left the company. Well, that's obvious because they wouldn't create a document after they left. But they said it's also limited by when we produced the information. Well, and that's another practical truth that, I mean, things—if you run a search terms today, you won't pick up what happens tomorrow. And we never claimed that they needed to rerun the search terms to find these missing documents. What we say is that when those documents were found a couple years later and given to their counsel, there was no date range that prevented their production. But again, how was their production not complete? If I run it today, give it over to the other side, the argument is that there was a duty to supplement. Is that not a request for—a new request for production of documents? Because my answer as of today's date is complete. Right. I think there's a number of cases on this. And the Seventh Circuit standard was always you only have to go back and add to it if not doing so would be a knowing concealment. And we think that's true here. We also think that the rules moved to a more general standard that doesn't have to have knowing concealment. Just in preparation for today, I pulled the latest Moore's. I think I quoted from the prior edition sitting in my office. But the fact that a document can be missed or even created later is all within the discovery supplementation. Are you saying we'd have to change our law in the circuit on this? Not at all. This amounts to knowing concealment. Also, that case—I don't want to say the name wrong—that case was interpreting the Rule 26 before it was redrafted. It's widely considered that the redrafting basically made it clear that it doesn't even have to be knowing concealment, but the circuit doesn't have to change the law because this is clearly knowing concealment. Mr. O'Brien, even if you're right, even if this was knowing concealment, then they should have turned this over to you before trial. In order to succeed on your motion for a new trial, one of the elements you have to prove is that this letter would probably produce a new trial result. Not possibly, but probably. Given that there were eight total potential causes of your client's heart attack, so seven other potential causes besides the high blood pressure, how could you possibly meet the standard of this one letter having to do with high blood pressure probably producing a new trial? We introduced a considerable amount of evidence that androderm causes heart attacks, a massive amount of scientific evidence, and then activists of course said it was caused by Mr. Martin's own health and failure to manage that. The jury had to weigh a lot of scientific evidence on our side, including the FDA saying that there needs to be a warning on the label of activist's product. And the jury heard all of that and rejected it. So the question is, and activists, as I went back and read the opening and the closing and some of the transcripts, and their argument was consistently, look, he has these eight potential causes. And high blood pressure was just one of those. There were seven other risk factors that could have caused the heart attack that the jury heard about. So how can we conclude that this letter from the FDA that a study should be conducted just solely on the high blood pressure probably would have produced a new trial? So they made the blood pressure issue the singular number one issue of their defense. That's not how I read the transcripts. When they talked about blood pressure, they talked about the seven other factors as well. It was in combination. Maybe I phrased that poorly. They made it the number one of the eight at every point. It was first in every chart. It was first in every approach. They mentioned it some 201 times during their trial time that I counted. Sure, but they mentioned these other factors as well. So whether or not this one document would probably produce a new result is a really high standard. And our case law has consistently said that's a very high standard. So what is your best argument that this FDA letter that they should have been directing them to conduct further studies with respect to high blood pressure and whether or not that's a problem with the drug probably would have produced a different result or a new result? It takes this complete issue and moves it from one side of the room to the other. The issue of who is at fault for his higher blood pressure. So not only is it the sixth reason that androderm could cause a heart attack in our expert list of the other five, but it's most definitely not a reason that he caused it himself. So we just ignore the other seven factors on his own? No, I think it just has to go back to a juried way. The scientific evidence on our side is massive, including everything the FDA has said about it. They submitted substantial scientific evidence as well, and obviously the jury was not persuaded by yours. Well, but the jury had the wrong picture. The jury had this issue in the wrong bucket because we didn't know that their drug was suspected of causing increased blood pressure. It also goes to their argument that the ongoing clinical trial, there's another clinical trial that's ongoing, that that must be turning out okay because there have been no safety signals. And they even said to the jury, separate from this, they said, we monitor for safety signals very carefully. I know we have limited time. I want to make sure, did Martin ever object to a date range? It's not clear from the briefing, and so I wanted to make sure. No, we never objected to their written discovery responses. There were no dates in the search term discussion. In case management plan 144, the district court permitted discovery to be extended after summary judgment rulings. And so I wanted to make sure. I know that there was a request made in Davis. There was a motion to compel filed in Davis. And because of the court's ruling, based on the new discovery that was submitted, that there was not new discovery submitted in the Martin case. Right. So Martin didn't have the same time periods because it had been a bellwether, so it was already prepped. It didn't need the CMO 144 periods. But the key here is that this didn't need a new discovery request. It actually relates to the search terms, and it relates to those written discovery requests as well. Which written discovery request? The original ones issued by the PSC, those long ones that I say weren't really operative. Well, they would have triggered this. Which one? Oh, the 2014. Oh, I'm sorry. You're saying which of them? Which request for production would have triggered turning over the March 2018 letter? I think it's 27 by memory. It's the one in my brief. I'm sorry, Your Honor. I assume my time has expired. You can answer Judge Pryor's question, or if you want to look at it when we hear from Mr. Lawrence and answer it when you come back up. I'll give you a couple of minutes for rebuttal. Thank you very much. Yeah, I will find it. Okay. Thank you. Mr. Lawrence? Good morning, Your Honor. May it please the Court, Andrew Lawrence on behalf of the athletes. The plaintiff in this case had a two-week trial in which he had every opportunity to persuade a jury of his peers that Andrew had caused his heart attack. But that trial did not go according to plan. Mr. Lawrence, hold on for just a second. If you'd stop the clock, please. We're getting some feedback here. Do you have the YouTube stream on? No. Do you have anything else on that should be muted on your end, Mr. Lawrence? I don't believe so, Your Honor. The Zoom is the only thing I have open. Okay. Okay. It could be your connection. Let's try it again and see. Can you hear me, Your Honor? We can hear you. We're just getting feedback on you. Okay. Let me try real quick to put in a headphone that might help. Okay. Yes, please try that. The clock isn't running, so don't worry. Can you hear me better now? Again, we can hear you. We're just still getting some feedback. Do you still have the feedback now, Your Honor? A little bit. Let's try. We'll keep going. We'll start the clock. All right. Thank you, Your Honor. Again, for the record, Andrew Lawrence, on behalf of the athletes, the plaintiff in this case had a two-week trial in which he had every opportunity to persuade a jury of his peers that Andrew Durden Paz was part of the attack. But that trial did not go according to plan for the plaintiff. Mr. Lawrence, can we start with the date range in the ESI? Sure. So ultimately, you know, as we laid out in our briefing, I think the court can resolve the due diligence problem on separate grounds. But I think the 2060 inquiry is equally straightforward. I'm sorry, Your Honor, can you hear me? It's just taking us a minute with the feedback. Go ahead. Okay. So I think, you know, the rule 2060 issue is fairly straightforward. So the standard under rule 2060 is that a party has a duty to supplement the party words that in some material respect, that disclosure or response is incomplete or incorrect. And the district court had the best understanding of the discovery requirements here. And it agreed with activists that the March, 2018 letter did not render any prior discovery responses, incomplete or incorrect. And I do think this ultimately boils down to two separate discovery responses that emanated from the generic discovery that occurred in the MDL. And the first is this February, 2015 request for regulatory documents. I want to talk about the ESI. Sure. So there is an email that goes out with search terms, February 11th of 2016. And directed by the district court to also develop and define the date ranges for ESI. Sure. Your Honor. So I think if you go to the district court docket and docket number 382 at page two, the plaintiff himself conceded that these search terms only possibly could have applied to something other than custodial protection. In reality, those search terms only applied to the custodial protection. And so I think once you establish that inquiry on the custodial protection and the search terms is very easy because it's undisputed here that activists' custodial protection, when it occurred, the vast majority of the custodial protection occurred before March 22nd, 2018. So it would not have included the letter of issue here. There are any false custodians. I lost you. Hold on just a second. Will you stop the clock, please? We're losing you a bit now. I think it'd be better if you just. Yes. Yeah. We believe it is on your end, Mr. Lawrence. Can you hang up and just call in? We're going to get that. Please. Yeah. We'll see. This is a test. Okay. If not, somebody will get a frantic call. Okay. Okay. Thank you. Okay. Mr. Lawrence, we see you. Are you there? We see your phone. Okay. Can you, can you hear me? Yes, we can hear you. Okay. Should I turn off my video or should I just do it through your phone? The phone is fine. You can, you can leave the video off. Just leave it like it is. What? Because we can hear you. Okay, great. So I think. We were last speaking about the custodial production. And the search terms. The search terms. The bottom line there is that the search terms only applied to the custodial production. It did not apply to the non custodial production. And that is significant because this March, 2018 FDA letter. When it was eventually discovered in July, 2021. It did not come from anybody's custodial file. And in fact, came from. Mr. Lawrence, but though. I'm sorry, your honor. Would did not have included the custodial file. Of Vilma. I'm pronouncing her last name. Incorrectly. S N I U K I E N E. Custodial collection. That was addressed in the district court. And the only reason the parties discovered that. That that individual's custodial file included this letter was because the district court separately. Ordered activists to conduct an additional sweep of the custodial files, but the plaintiff has already conceded that. Activists was under no such obligation. And so when you go back, you know, in time, sort of before. The district court ordered the part ported activists to conduct that additional sweep. And so, you know, it was under it is undisputed that at the time. Of activists is actual production. All of the custodial collections, the majority of which took place before March, 2018. A handful of which occurred after March, 2018, but all of those employees. Had left the employment of activists well beforehand. All of that initial custodial production was both complete. And correct when it occurred in the plaintiff has conceded multiple times, including in this court. That the plaintiff had no duty to conduct an additional round of custodial production. And I think when you have those two pieces, I think. I mean, you know, it's a fairly straightforward inquiry because again, this, this March, 2018 letter was found. In a non-custodial regulatory file. That letter was addressed to somebody who was not a custodian. And so when, you know, under rule 26 E, whether, when the inquiry is, I don't see how you can say that here when this, this letter at issue here came from a non-custodial file. It was addressed to somebody who was not a custodian. And the plaintiff has conceded that activist was under no obligation. To conduct an additional round of custodial sweeps. I'm sorry. They'll know what. I'm sorry. She was a custodian, but she was not the recipient of the March, 2018 letter at issue here. So she was one of the 44 custodians. And. You know, as the current, as was explained, you know, in the district court, it's an additional round. Of custodial production were required to occur. Then that additional round would have yielded this March, 2018 letter. But the parties are in agreement that. The plaintiff was under no obligation to conduct that additional round. So in light of that concession, the question then becomes whether activists would have known that. It's it had a duty to supplement. It's custodial production. Based on the fact that it discovered. Mr. Lawrence. 382 dash. I'm sorry. You directed us to 382 dash two. I'm sorry. I'm sorry. I'm still not finding a date range for ESI. But the ESI, as we laid out in the brief. That was conducted. Pursuant to date ranges. Where it was either when the production occurred or when the employee had left the employment of activists. And so, and nobody, no party. Including the plaintiff here ever disputed those date ranges in the, in sort of typical practice. As in the MDL was that if the party wanted additional production, they would request it. But again, here, you know, the plaintiff has. You never requested that additional production has conceded that we're that activists was under no obligation. To conduct an additional round of production. So that only helps you so much, Mr. Lawrence, the, their concession that you didn't have to conduct an extra round of. Discovery. It doesn't really apply here because you actually found this document and you had this document before the trial began. Sure. So, I mean, the document would have to be responsive. To a request for discovery here, which is. Asking you questions about the, any time limits, because I think you would concede. Without your argument about time limits, it would be responsive to the PSC discovery requests. Certainly the regulatory ones issued in February of 2015. So I disagree with that, your honor, because the February 20, 2015 requests from the plaintiff steering committee, you know, as, as was discussed earlier, you know, activists responded to that by saying that there's a 2010 to 2014 date range that, you know, it produced documents only within that date range. And as a district to marketing though. And my question was the take the date range out. I think you would agree because there's a dispute about the date range. I think you would agree that this 2018 letter from the FDA. Would have been responsive to a prior request, but for your argument about the date range. Sure. But for the argument, but the parties understood that a 2010 to 2014 date range applied, and that includes the plaintiff's attorney here. And I would direct. Brian has said. I would direct the court to the companion Davis case because to obtain regulatory documents for the post 2014 period, including the very document at issue here, he was not pointing to the plaintiff's steering committee requests from February, 2015. He, in fact, invoked case management order one 44. And invoking case management order one 44 is highly significant because that is a tool that is explicitly designed to, to allow an opt out plaintiff to obtain discovery materials that prior requests in the MDL, such as that February, 2015 requests did not capture. So if the PSDs requests from 2015 actually encompass that post 2014 period, then their requests in the Davis case that ultimately yielded this March, 2018 letter would, would simply make no sense. But again, I mean, the plaintiff has a duty to, you know, establish five different factors under rule 59 E this is only one of them. And I think there are multiple reasons why he can't establish the due diligence factor that don't implicate rule 26 E. But even if you set all that aside, there is the separate likelihood of a different outcome factor. And I don't think the plaintiff has come anywhere close to meeting that factor either. And I mean, under rule under that factor, the plaintiff had a duty to clearly establish that the new evidence would probably produce a result in a new trial. And as was discussed earlier, you know, the activists at trial, you know, since July 12th of 2021, it's given to council July 12th trial starts August 5th. This letter is not, that's right. Your honor. Until the end of Martin's trial. Right. And I do think it's important to bear in mind that this March, 2018 letter, it came out in response to a request in a, in a separate case in the Davis case. And that case is still ongoing. That trial has not occurred. And so the plaintiff in that case who, who submitted this request, you know, received it well in advance of the trial. And of course, you know, Mr. Martin was free to make a similar request in his case to ensure that, you know, he could have received this document before August, 2021, but he did not submit any such requests. So I think that, that's also going back to the due diligence factor. And I think there are multiple cases from this court, including cases like the Cincinnati life insurance case and the OTO case, both of which we discussed in our response brief, you know, those cases make clear that if a party fails to make inquiries regarding, you know, relevant evidence before, you know, the end of the trial and it fails to do so, then that establishes that, that, that they cannot satisfy the due diligence factor. And of course, you know, the plaintiff also received in, in the Davis case, the plaintiff's lawyer there received the multiple other documents that put him on notice about, you know, this blood pressure study. And he has never disputed that the, that the knowledge that he gained in that separate Davis case is imputed to his client here because the plaintiff's lawyer here is the same one as the plaintiff's lawyer in the Davis case. And so, you know, going back to June is the theory that was proposed in the NDL as well as in the Martin trial is that his blood pressure, Martin's blood pressure, although it was already high, increasingly, it significantly increased as a result of taking the medication. Wouldn't the FDA letter, if it had been provided support Martin's theory of causation in essence, be more persuasive? It would not your honor, because I think it's important to remember what the March, 2018 letter is actually saying. And ultimately it's saying that the relationship between androderm and blood pressure is unknown. And so, you know, I don't think you can say that this would have somehow flipped the verdict entirely when it's, when the letter is just saying that the relationship is unknown, therefore activists has to conduct, you know, this additional study to determine the relationship between androderm and high blood pressure. So it's all it's doing is that it's announcing the fact of the study beginning. And, you know, I also think it's, you know, pretty significant that the jury here heard about other post-marketing studies and plaintiff's counsel referenced one during his opening, which is the Traverse study. Now, the Traverse study was specifically looking at whether testosterone replacement therapies like androderm cause heart attacks. So the jury heard all about, you know, another kind of post-marketing study and one directly implicating whether, you know, drugs like androderm caused heart attacks. And yet it's still ruled in activists' favor in about, you know, 30 minutes after a two week trial, you know, after hearing all this evidence that plaintiff had, you know, multiple risk factors that were uncontrolled and any one of which is independently sufficient to cause a heart attack. And the plaintiff's own experts agreed with the fact that any single one of those factors, risk factors is independently sufficient to cause a heart attack. So I just don't think you can say that, that this March, 2018 letter alone, which was just announcing the beginning of a study would have flipped the verdict entirely. Can we stop the clock, please? Okay. Okay. Yeah. Okay. Um, I mean, you can show your video. I don't know if we're going to have audio. Um, try to dial back. Um, and again, hopefully it'll work. I'll analyze. Okay. Are you there? Mr. Lawrence? I am. Can you hear me, your honor? Yes. Okay. You have 47 seconds left, so hopefully we won't lose you. Okay, great. Um, so, I mean, I think, you know, no matter how the court approaches it, whether it's from the due diligence factor or whether it's from a likelihood of a different outcome factor or one of the, uh, you know, three remaining factors. I mean, I just don't see how, uh, the plaintiff can satisfy his rule 59 E burden. And that is an extraordinarily high burden. Um, as this court has said multiple times rule 59 E relief is an extraordinary remedy. It is reserved for the exceptional case. Um, and this is not one such case unless the court has any further questions. We'd ask the court to affirm. Thank you, Mr. Lawrence. Thank you, Mr. O'Brien. Well, excuse me, we'll give you two minutes. Your honor. Thank you very much. Um, may I first, uh, address, uh, just prior to your question. Uh, and I'm sorry if I was scattered before, but it's a request 27 that dealt directly with this. Um, and to that end, I'd point out that I think the court issued the CMO instructing parties to, uh, agree on search terms, uh, maybe in 14 or early 15. Um, and then, uh, we passed back and forth, these written discovery requests, but because the court had also instructed us to do the activist discovery later, uh, the search term negotiation happened after we passed back and forth the written discovery requests. Um, and it's the search terms that ends in February, 2016 with an agreement. It's a search terms that controlled all production for, for multiple years. Nobody ever picked up that discovery requests again. Um, and if I could address one point real quickly, your honors, um, the question of whether the search terms applied to custodial areas is a little bit of a red Herring. Um, all that was meant there is that at one time the PS is not relevant here at all, but the PSC said, you shouldn't restrict what comes out of that custodial non custodial area by putting search terms against it. You should just give us everything. And none of that matters because whether you applied search terms or give us everything out of that area, this document is responsive either way. Uh, so I think that could be a little bit of a red Herring. Um, and the few seconds, uh, I have left. Um, I wanted to point out that, that the, as you go through the transcript and the exhibits and everything, blood pressure was the, was the lead of the eight issues, the defense used. And so not only does it take it away from their side, but it actually puts it on Martin's side. That could be one more reason Manderderm caused the heart attack. Thank you, Mr. O'Brien. Thank you very much. The court will take the case under advisement.